IRVING PEARLSTEIN AND FLORA PEARLSTEIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ALLAN H. PEARLSTEIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pearlstein v. Commissioner
Docket Nos. 5551-81; 5552-81
United States Tax Court
T.C. Memo 1989-621; 1989 Tax Ct. Memo LEXIS 621; 58 T.C.M. (CCH) 699; T.C.M. (RIA) 89621; November 16, 1989; As corrected November 22, 1989 Stephen D. Gardner, John Hartje, and Robert Lord, for the petitioners. Theodore J. Kletnick, Jo-Ann Fox, and Susan Grossman, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In timely statutory notices of deficiency, respondent determined the following deficiencies in petitioners' 1974 Federal income taxes: Petitioners
Docket No.
Deficiency
Irving and Flora Pearlstein
5551-81
$ 95,518.60
Allan H. Pearlstein
5552-81
93,710.00
*623 At trial, respondent was allowed to amend his answer to claim additional interest under section 6621(c). [1]
These consolidated cases involve investments by a partnership in two equipment-leasing, sale-leaseback transactions. The investments are unusual in that, apart from tax benefits, they earned a profit for the partnership of approximately $ 2 million on the partners' total combined cash investment of $ 2 million (a 100-percent profit). The deductions at issue relate to investments of a limited partnership by the name of Wyatt Associates ("Wyatt"). The primary issues for decision are: (1) Whether the equipment-leasing and sale-leaseback transactions lacked economic substance; (2) whether ownership of the equipment was transferred to Wyatt and whether Wyatt's nonrecourse debt obligations associated with the transactions reflect genuine indebtedness; (3) whether the transactions were entered into for profit within the meaning of section 183; (4) whether Wyatt is entitled to claim a full year of depreciation on equipment purchased in June *624 of 1974; (5) whether certain prepaid interest was deductible in 1974; and (6) whether allocations of income and losses among the partners of Wyatt should be recognized for Federal income tax purposes. FINDINGS OF FACT Many facts have been stipulated and are so found. Petitioners Irving and Flora Pearlstein are husband and wife and resided in Palm Beach, Florida, when they filed their petition. Petitioner Allan H. Pearlstein resided in Baltimore, Maryland when he filed his petition. All petitioners timely filed Federal income tax returns for 1974 and used the cash method of accounting. Throughout the 1960's and 1970's, petitioners with other members of their families owned a shoe-manufacturing business managed by petitioners Irving and Allan Pearlstein. Petitioners had invested most of their assets in this business. In 1972, petitioners decided to diversify their investments. They asked their certified public accountant to investigate investments outside the shoe industry and the stock market. After analyzing several investments over the course of two years, the certified public accountant recommended that petitioners invest in the Wyatt equipment leasing limited partnership.
*625 On or about June 12, 1974, petitioners Irving and Flora Pearlstein jointly invested $ 50,000 in Wyatt and petitioner Allan Pearlstein invested $ 50,000. Wyatt Associates
The Wyatt partnership was nominally established on January 30, 1973, as a Washington, D.C. limited partnership for the purpose of engaging in the equipment-leasing business. At the time of trial, the principal place of business of Wyatt was in New York City. Wyatt did not own any property nor did it engage in business until June 28, 1974. In the spring of 1974, offering memoranda soliciting investments in Wyatt were circulated. The offering memoranda described the organization of Wyatt, disclosed the significant economic risks associated with equipment-leasing transactions, and described anticipated terms of the contemplated transactions. The offering memoranda also made projections of cash flow, profits, and tax benefits of the contemplated equipment-leasing transactions. Thirty investors (generally referred to herein as "the contributing partners") agreed to invest in Wyatt as limited partners. The contributing partners in the aggregate made total capital contributions to Wyatt of $ 2,021,717. *626 Investments by the various contributing partners ranged from $ 28,409 to $ 160,000. Wyatt's limited partnership agreement specified how losses, net income, net investment proceeds, and residual proceeds of the partnership were to be allocated and distributed among the partners. Losses of Wyatt were to be allocated annually -- 100 percent to the contributing partners. Net income was to be allocated annually 30 percent to the contributing partners and 70 percent to the general partners. Equipment Purchased -- Computer Equipment and Airplane
In June of 1974, Wyatt entered into a master purchase agreement with Castle Group, Inc. ("Castle") to purchase from Castle equipment having an aggregate purchase price of not less than $ 12,750,000 and not more than $ 25,000,000. The equipment to be purchased was to be already on lease to end users with credit ratings acceptable to Wyatt. Wyatt was to pay Castle a price for the equipment equal to not more than 95 percent of the appraised fair market value of the equipment, with a cash down payment of 1.5 percent of the total purchase price and the balance to be reflected by a five-year nonrecourse promissory note, bearing 12-percent *627 interest per year secured by the equipment. At closing, Wyatt also was to prepay interest on the nonrecourse note attributable to the last 15 months of the five-year note. Under the terms of the master purchase agreement, on June 28, 1974, Wyatt purchased [2] from Castle computer equipment manufactured by a number of companies including International Business Machines ("IBM"), General Electric Corporation ("GE"), and Basic Four. Included in the equipment purchased were the following types of computer equipment listed by company: IBM: Series 360/65 central processing unit, series 3330 disk drives, and peripheral equipment. GE: Series 100, 400, and 600 processing units, and peripheral equipment. Basic Four: Series 350 and 400 small business computers. Additional computer equipment manufactured by Texas Instruments, *628 Digital Equipment Company, Microdata Corporation, Olivetti Corporation of America, and Phillips Business Systems was included in the computer equipment Wyatt purchased from Castle. All of the equipment was on lease to end users on a net-lease basis. In addition to the above computer equipment, on June 28, 1974, Wyatt purchased from Castle a DC-9-31 airplane manufactured by McDonnell Douglas. McDonnell Douglas first introduced DC-9 model airplanes in 1965. Since then, McDonnell Douglas has improved the DC-9 airplane and has manufactured series 10 through 40 of the DC-9 airplane. As of the time of trial, most DC-9 airplanes in service and on order were from the DC-9-30 series, few had been sold or traded in the used airplane market, and the new price of airplanes in the DC-9-30 series had increased 33 percent from the new-1969 sales price. The particular DC-9-31 airplane purchased by Wyatt in 1974 was manufactured in 1969 and was being maintained by Eastern Airlines ("EAL"). At the time Wyatt purchased the airplane, the airplane was in good condition, and EAL recently had performed a major overhaul on the airplane. The total purchase price Wyatt agreed to pay for the computer *629 equipment and the DC-9-31 airplane was $ 17,183,746. Wyatt made a cash down payment to Castle of $ 262,809, and Wyatt gave Castle two nonrecourse five-year promissory notes in the total amount of $ 16,920,937. Consistent with the terms of the master purchase agreement, at closing Wyatt also paid Castle $ 1,758,808 in prepaid interest, representing interest due on the Wyatt promissory notes for the last 15 months of the five-year notes. Immediately prior to the sale to Wyatt, Castle had purchased much of the computer equipment (including the IBM equipment) and the DC-9-31 airplane from NRG, Inc. ("NRG"), a general equipment leasing company. Wyatt's promissory note in favor of Castle that related to the computer equipment and the DC-9-31 airplane purchased by Castle from NRG (the "Wyatt-Castle-NRG" promissory note) was in the amount of $ 13,450,258. The schedule of note payments due on the Wyatt-Castle-NRG promissory note was as follows: Monthly
Payment
Payment of
Date
of Interest
Principal
6/28/74
$ 1,398,056 prepayment
7/01/74 -- 12/1/74
$    44,850 per month
--
1/01/75 --  3/1/78
*
$   267,090 *
4/01/78 --  6/1/79
--
$   197,459 to
$     224,675 **
6/30/79
$ 4,017,401 balloon
*630 The computer equipment sold to Wyatt that had not been purchased by Castle from NRG was purchased by Castle (also just prior to its sale to Wyatt) from O.P.M. Leasing Services, Inc. ("OPM"), another general equipment-leasing company. Wyatt's promissory note attributable to the computer equipment purchased by Castle from OPM (the "Wyatt-Castle-OPM" promissory note) was in the amount of $ 3,470,679. Payments due on this promissory note were as follows: Monthly
Payments
Payments of
Date
of Interest
Principal
6/28/74
$ 360,752 prepayment
--
7/01/74 -- 12/1/74
$  11,573 per month
--
1/01/75 --  3/1/78
*
$    68,920 *
4/01/78 --  6/1/79
--
$    50,436 to
$      57,975 **
6/30/79
--
$ 1,036,643 balloon
Castle's interest as creditor under the two Wyatt promissory notes *631 was secured by security interests in the underlying end-user leases and in the equipment, subordinate to the security interests of the leasing companies and other secured creditors in the equipment. For its purchase of the computer equipment and airplane, Castle agreed to pay a total purchase price of $ 15,738,615 ($ 12,534,291 to NRG and $ 3,204,324 to OPM). Castle made a $ 1,124,872 cash down payment to NRG and gave NRG two nonrecourse promissory notes in the total amount of $ 11,409,419. Castle made a $ 260,260 cash down payment to OPM and gave OPM two nonrecourse promissory notes in the total amount of $ 2,944,064. Prior to the June 28, 1974, sale of the computer equipment and DC-9-31 airplane to Castle and Wyatt, NRG and OPM had purchased the equipment over a period of years and had leased the equipment to various end users. The DC-9-31 airplane was originally purchased new by NRG on January 23, 1969, for $ 4,205,455. On March 21, 1969, the DC-9-31 airplane was leased to Systems Capital Aircraft, Inc. ("SCA"), for a base term of 12 years expiring on March 20, 1981. SCA assigned its interest in the lease to Commercial Aircraft Leasing Company ("CALCO"), which later became *632 an operating division of Geothermal Resources International, Inc. ("GRI"). On December 15, 1969, GRI subleased the DC-9-31 airplane to EAL under a short-term aircraft utilization contract ("STAUC") for a 15-month base term scheduled to expire on March 20, 1971. After expiration of the base term, EAL had the right to renew the sublease for additional two-year terms over a 12-year period through March 20, 1981, with further one-year renewal options thereafter. Under the STAUC agreement, EAL was required to give written notice to GRI of its intent to renew the lease six months before the then-current term expired. If EAL failed to give the required six-month written notice of renewal, the lease would expire at the end of the then-current two-year lease term. EAL's lease payments under the STAUC agreement were to be made quarterly in an amount equal to 2.9 percent of the original purchase price of the airplane or about $ 121,958 per quarter. EAL also had the option to convert the STAUC agreement into a long-term sublease which would expire on March 20, 1981. Lease payments under the long-term sublease would be due quarterly in an amount equal to 2.45 percent of the original cost *633 of the airplane or about $ 103,033 per quarter. In June of 1974, at the time of the transactions at issue, EAL had renewed the STAUC agreement for the two-year period from March 21, 1973, through March 20, 1975. Immediately after purchasing the computer equipment and airplane from NRG and OPM, Castle leased the computer equipment and airplane back to NRG and OPM. Upon Wyatt's purchase of the computer equipment and airplane, Castle assigned these leases to Wyatt. In form, on June 28, 1974, the rights and obligations of the owner-lessors of the computer equipment and airplane were transferred from NRG and OPM to Castle and then immediately from Castle to Wyatt, without any change in the end-user leases or in the identity of the end users. The parties (namely, Wyatt, Castle, and the leasing companies) entered into trust agreements under which they stipulated how the various lease payments and note payments would be applied to the debt obligations associated with these transactions. Lease payments due from the leasing companies to Castle and assigned to Wyatt were to be applied first to payments due on Wyatt's promissory notes, second to amounts Wyatt owed in connection with trusts *634 set up under the agreements, and third to Wyatt as owner of the equipment. At each stage of the transactions, the corporate participants took the following actions: (1) Adopted board of directors' resolutions authorizing the sale of the equipment at issue; (2) executed security interests in favor of the appropriate participants; (3) provided warranties to other participants that all property and sales taxes on the equipment had been paid; and (4) consented to assignment of the leases to Wyatt. Wyatt also executed the appropriate security interests and filed a registration application with the Federal Aviation Administration with regard to the DC-9-31 airplane. Castle's business objectives for participating in the multi-party sale-leaseback transactions were to earn income in 1974 through receipt from Wyatt of the prepaid interest and through the difference between the financing costs of its purchase of the equipment from the leasing companies and the financing income it would receive on the sale of the equipment to Wyatt. Transactions Subsequent to Initial Sale-leaseback Transactions
Consistent with the terms of the various lease and note obligations between Wyatt, *635 Castle, and NRG, during the period June 28, 1974 through December 31, 1974, Wyatt did not receive any positive cash flow on the NRG-related equipment leases. From January 1, 1975 through September 30, 1975, in addition to the monthly offsetting lease and note payments of $ 267,090, Wyatt received additional lease payments of $ 23,898 per month with respect to the NRG-related computer equipment and airplane, for a cumulative net cash received during this period of $ 215,082 from lease payments attributable to the NRG-related equipment. In the fall of 1975, NRG experienced financial difficulties and failed to make payments due Wyatt with respect to the lease of the NRG-related computer equipment. On November 26, 1975, with approval of Wyatt's partners, NRG repurchased the computer equipment sold to Castle and Wyatt in 1974. The total stated purchase price for the repurchase of the computer equipment was $ 5,454,630, reflected by a $ 5,454,630, nonrecourse promissory note in favor of Wyatt with an interest rate of 5.889 percent per year. The DC-9-31 airplane was not part of the equipment repurchased by NRG. From late 1975 through 1979, NRG and Castle continued to experience financial *636 difficulties. As a result, Wyatt, Castle, and NRG further restructured the transactions between them. Eventually, on September 30, 1979, all debt obligations of Castle to NRG and of Wyatt to Castle and to NRG with respect to the NRG-related computer equipment and the DC-9-31 airplane were canceled, and as of October 1, 1979, Wyatt's ownership interest in the DC-9-31 airplane was relieved of any security interests therein previously held by Castle and NRG. Consistent with the terms of the various lease and note obligations between Wyatt, Castle, and OPM, during the period June 28, 1974, through December 31, 1974, Wyatt did not receive any positive cash flow on the OPM-related computer equipment leases. From January 1, 1975, through June 30, 1979, in addition to offsetting lease and note payments of $ 68,920 per month, Wyatt received $ 6,166 per month for a cumulative net cash received during this period of $ 332,964 with respect to the OPM-related computer equipment leases. In spite of the positive cash flow through June of 1979 on the OPM-related equipment, financial difficulties also had arisen with respect to the sale-leaseback transaction between Wyatt, Castle, and OPM. On *637 April 1, 1978, Castle defaulted on the related debt obligations it owed OPM, and in April of 1978, Wyatt, Castle, and OPM entered into an assumption agreement under which Wyatt assumed Castle's debt obligations to OPM on the Castle-OPM Note, and Wyatt's indebtedness to Castle on the Wyatt-Castle-OPM note was canceled. On June 30, 1979, Wyatt defaulted on the $ 414,656 balloon payment due on the Castle-OPM Note that Wyatt had assumed. At that time, OPM, as the secured party under the security agreement, repossessed the OPM-related computer equipment Wyatt had purchased from Castle. In 1979, EAL failed to properly notify GRI of its intent to renew the previously mentioned STAUC sublease on the DC-9-31 airplane owned by Wyatt and leased to GRI for the lease term beginning March 20, 1979. In light of the airplane's significant increase in value, GRI, as sublessor of the airplane, sued EAL for return of the DC-9-31 airplane. On November 7, 1979, in settlement of the lawsuit brought by GRI against EAL, an airplane purchase agreement was entered into between Wyatt, GRI, and EAL for the sale of the DC-9-31 airplane to EAL. Under the agreement, EAL agreed to make an initial cash payment *638 of $ 2,525,000. If EAL thereafter sold the DC-9-31 airplane before December 31, 1984, EAL would be obligated to pay Wyatt and GRI an additional amount which was to be the amount by which the total sales proceeds EAL realized on the sale exceeded $ 2.6 million. If EAL did not sell the DC-9-31 airplane before December 31, 1984, EAL at that time would be obligated to pay Wyatt the amount by which the fair market value of the DC-9-31 airplane, determined by appraisal as of December 31, 1984, exceeded $ 2.6 million. Due to certain rights that GRI (the original and continuing sublessor of the airplane) claimed in the DC-9-31 airplane, on November 9, 1979, Wyatt entered into an agreement with GRI and Aircraft Financial Corporation ("AFC"), the original creditor on the purchase of the DC-9-31 airplane by NRG and which creditor still held a security interest in the airplane. Under this agreement, Wyatt, GRI, and AFC agreed to share all of the proceeds to be received from the sale of the airplane to EAL. Wyatt was to receive the first $ 1,785,000 of the sale proceeds after payment to AFC of the principal balance outstanding on the original indebtedness with respect to the airplane. Any *639 remaining proceeds were to be shared by Wyatt and GRI in a ratio of 55 percent to 45 percent, respectively. On February 1, 1980, NRG and Castle executed release documents reflecting that Wyatt and Castle had satisfied their debt obligations to NRG, and that Wyatt, NRG, and Castle released their interests in the airplane to EAL. On February 1, 1980, the DC-9-31 airplane was sold to EAL in accordance with the terms of the above-mentioned November 7, 1979, purchase agreement. On February 1, 1980, the cash payment called for under the agreement was made by EAL to Wyatt and GRI, adjusted downward to $ 2,421,966 to credit EAL for lease payments made after November 7, 1979. EAL paid Wyatt cash in the amount of $ 2,073,791, and GRI cash in the amount of $ 348,174.63. Of the $ 2,073,791 received from EAL, Wyatt allocated $ 1,626,337 to the contributing partners of Wyatt ($ 83,086 for each $ 100,000 invested by the contributing partners). [3]
EAL continued to own the DC-9-31 airplane *640 beyond December 31, 1984, and, pursuant to the terms of the above-described agreement, appraisers were hired by EAL, Wyatt, and GRI to determine the fair market value of the DC-9-31 airplane as of December 31, 1984. The appraisers for EAL, Wyatt, and GRI determined that the December 31, 1984, fair market value of the DC-9-31 airplane was $ 6,100,000. As explained, EAL was obligated to pay the excess of the fair market value over $ 2.6 million to Wyatt and GRI. Accordingly, EAL paid $ 3.5 million to Wyatt and GRI. [4]Wyatt and GRI divided these sales proceeds in the ratio indicated above of 55 percent to 45 percent, Wyatt receiving $ 1,925,000. Of that amount $ 1,891,312 was allocated to Wyatt's contributing partners ($ 62,308 for each $ 100,000 invested), based on Wyatt's allocation formula for "residual proceeds." For Federal income tax purposes, Wyatt was a cash-basis taxpayer. Set forth below are the total taxable income and loss figures reported on Wyatt's Federal income tax returns for the years 1974 through 1983: Total Reported
Year
Income or Loss
1974
$ (5,995,894)
1975
$ (  402,174)
1976
$    386,509 1977
$  2,127,430 1978
$  3,113,772 1979
$  2,641,716 1980
$  2,396,943 1981
$    380,040 1982
$    371,897 1983
$    366,022 *641 Expert Witnesses
In June of 1974, appraisers were retained by parties to the transactions to value the NRG- and OPM-related computer equipment and the DC-9-31 airplane. At trial, additional experts were retained by petitioners and by respondent to value the same equipment, and respondent also retained a financial analyst to evaluate the economics of the transactions. With the exception of the appraiser retained in June of 1974 to value the OPM-related computer equipment on behalf of Wyatt, each of the appraisers retained with respect to the computer equipment has been employed in the data processing or computer industry for at least 20 years. Each expert was qualified to appraise the fair market value and residual value of the equipment. The appraisals pertaining to the computer equipment are summarized below: NRG Non-IBM-Related Computer Equipment
Original
Year
Invoice Cost
Appraisal
or
Fair Market Value
Appraiser
Completed
List Price
June 1974
July 1979
Wyatt's
1974
$ 14,620,053
$ 9,279,32
* $ 846,092
Respondent's
1985
$ 14,905,544
$   596,250
-0-
Respondent's
1985
$ 14,595,587
$ 1,928,040
-0-
*642 NRG IBM 360-65 Computer Equipment
Original
Year
Invoice Cost
Appraisal
or
Fair Market Value
Appraiser
Completed
List Price
June 1974
July 1979 *
Wyatt's
1974
**    $ 1,042,626
$  50,803
Respondent's
1985
$ 2,062,190
$   515,550
$ 154,700
Respondent's
1985
$ 2,046,390
$   389,000
-0-
OPM Computer Equipment
Original
Year
Invoice Cost
Appraisal
or
Fair Market Value
Appraiser
Completed
List Price
June 1974
July 1979
Wyatt's
1974
$ 3,524,584
$ 3,524,584
--
Wyatt's
1985
$ 3,661,000
$ 3,682,800**
$   776,000***
to
to
$ 3,797,200
$ 1,968,000
Respondent's
1985
$ 2,157,350
$ 1,861,280
$   319,450
Appraisers were retained by or on behalf of Wyatt and respondent to appraise the value of the DC-9-31 airplane. *643 Both appraisers have had at least 25 years experience in the airline industry. The appraiser retained on behalf of Wyatt participated in the initial specification review of DC-9 airplanes conducted by McDonnell Douglas in the early 1960's, critiqued the design for DC-9 airplanes, and in 1974 assisted in designing a computerized maintenance program for DC-9 airplanes. The two experts appraised the fair market value of the DC-9-31 airplane as of June 28, 1974, and the residual value thereof as of July 1979. The appraisals are summarized below: DC-9-31 Airplane
Date
Invoice Cost
Appraisal
or
Fair Market Value
Appraiser
Completed
List Price
June 1974
July 1979
Wyatt's
1974
$ 4,191,683 $ 4,075,000
$ 3,250,000
Respondent's
1985
$ 4,200,000
* $ 3,900,000
$ 2,423,000
*644 The appraisers relied on by Wyatt determined that the projected useful lives of the computer equipment and the DC-9-31 airplane extended generally beyond the five-year term of the leases. Respondent's experts determined that the projected useful lives of neither the computer equipment nor the airplane extended beyond the five-year lease terms. As mentioned, respondent also retained an individual to analyze certain economic aspects of the transactions Wyatt entered into. This individual had expertise in evaluating the economics of business transactions, in cash-flow reporting, and in financial and accounting systems. This individual determined that, in his opinion, the transactions at issue lacked economic substance and were designed solely for tax avoidance purposes. OPINION Sham Transactions
The first issue for decision is whether the sale-leaseback transactions entered into by Wyatt lacked economic substance. Business transactions generally are given effect consistent with their form and substance. In determining their form and substance, we cannot ignore the fact that tax laws affect the shape of most business transactions. Frank Lyon Co. v. United States, 435 U.S. 561, 580 (1978). *645 Business transactions, therefore, will not be found to be without substance merely because they provide significant tax benefits to investors. Frank Lyon Co. v. United States, supra at 580-581; Estate of Thomas v. Commissioner , 84 T.C. 412, 432 (1985). Where it is found, however, that investors entered into transactions with the sole purpose of obtaining tax benefits and where the transactions are devoid of economic substance because no reasonable opportunity for economic profit existed, apart from tax benefits, the transactions will be treated as economic shams for Federal income tax purposes. Levy v. Commissioner, 91 T.C. 838, 853-854 (1988); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 209-210 (1983), affd. in part 752 F.2d 89 (4th Cir. 1985); Estate of Thomas v. Commissioner, supra at 438-439. An examination into the business purpose and economic substance of transactions is inherently factual. Levy v. Commissioner, supra at 854; Larsen v. Commissioner, 89 T.C. 1229, 1252 (1987); Rice's Toyota World, Inc. v. Commissioner, supra at 203. *646 The business purpose inquiry concerns investors' subjective motives for entering into transactions. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 92. The economic substance inquiry requires an analysis of objective factors that bear upon whether the transactions had a reasonable opportunity of producing a profit, apart from tax benefits. Rice's Toyota World, Inc. v. Commissioner, supra at 94; Levy v. Commissioner, supra at 854; Packard v. Commissioner, 85 T.C. 397, 417 (1985). Based on an examination of the relevant facts and evidence before us, we conclude that Wyatt entered into the transactions at issue for a valid business purpose (namely, to engage in good faith in the equipment-leasing business). The promoters of Wyatt who negotiated the transactions on behalf of Wyatt were familiar with computer equipment, airplanes, the equipment-leasing and the airline businesses, venture capital financing, and the Federal tax consequences of equipment leasing transactions. At the time of purchase of the equipment, independent appraisals of the then fair market value and (with exception of the OPM equipment) *647 of the projected residual value of the equipment were obtained from qualified experts. Competent lawyers were retained to handle legal aspects of the complex transactions including a review of all documents to ensure that Wyatt received valid title to the equipment and that the equipment was subject to valid end-user leases. We are satisfied that Wyatt entered into the transactions with a substantial business purpose. The promoters of and investors in Wyatt participated in the transactions because they believed Wyatt had a reasonable prospect of realizing a profit from the lease payments and residual value of the equipment. In determining whether equipment-leasing and sale-leaseback transactions have economic substance apart from tax benefits, the following factors are significant: (1) The presence or absence of arm's-length negotiations; (2) the relationship between the sales price and fair market value of the equipment; (3) the structure of the financing; (4) the degree of adherence to contractual terms; and (5) the reasonableness of income and residual value projections. Levy v. Commissioner, supra at 856; Helba v. Commissioner, 87 T.C. 983, 1005-1011 (1986), *648 affd. without published opinion 860 F.2d 1075 (3d Cir. 1988), cert. denied 490 U.S. (1989); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 204-207. In applying the above standards to the equipment leasing transactions Wyatt entered into, we conclude that the transactions had economic substance. The purchase by Wyatt from Castle, in June of 1974, was negotiated at arm's length. Before the purchase, independent appraisers were retained to determine the then fair market value and, with the exception of the OPM computer equipment, the residual value of the computer equipment and the DC-9-31 airplane. The total fair market value of the equipment was appraised at $ 17,921,572, and a purchase price of $ 17,183,746 was agreed upon. At the time of the purchase by Wyatt, most of the equipment was on lease to end users and the revenue from the end-user leases was being used to service debt obligations owed to the initial creditors. We accept Wyatt's reliance on the experts' opinions that the existing end-user leases increased the value of the equipment. Based on information Wyatt received from the experts, the agreed purchase price for the equipment *649 was reasonable and was not inflated. At each stage of the transaction, the purchase of the equipment was financed by a cash down payment and by nonrecourse debt obligations. The cash down payment and the amount of the nonrecourse promissory notes totaled the purchase price, which was based on the fair market value of the equipment. Each participant in the transactions expected to earn a profit on the sale of the equipment based on the financial structure of the transactions combined with each participant's specific financial status at the time of the transactions. Under the five-year fixed leases between NRG and OPM (as lessees) and Castle (as lessor), which leases were assigned to Wyatt, total monthly lease payments from NRG and OPM to Wyatt were to be $ 30,064 more than Wyatt's monthly note payments to Castle. Wyatt, Castle, and the leasing companies properly documented the transactions, received approval from the appropriate corporate officers and general partners, and in all other respects honored the form of the transfer of ownership of the computer equipment and airplane to Wyatt. In 1975, when NRG failed to make certain lease payments, the participants restructured *650 the transaction involving NRG in an effort to keep NRG from declaring bankruptcy, which otherwise might have resulted in further losses to all participants. In restructuring the transaction, Wyatt agreed to sell some of the computer equipment back to Castle (which immediately resold it to NRG), and NRG's and Castle's security interests in the DC-9-31 airplane were extinguished. In 1978, when Castle defaulted on the Castle-NRG and Castle-OPM promissory notes, Wyatt assumed Castle's obligations to NRG and OPM to protect its interest in the equipment. From the time of restructuring the transactions in 1978 through June 30, 1979, NRG and OPM made all payments required under the lease agreements and promissory notes resulting from the restructured transactions. For the same time period, Wyatt made all required debt payments. In 1979, however, Wyatt did default on the $ 414,656 balloon payment due on the Castle-OPM balloon note Wyatt had assumed. With the one exception of the default on the balloon note, the parties adhered to the form of the transactions as entered into or as restructured. The parties intended to enforce the original promissory notes pursuant to their terms, to *651 enforce the promissory notes entered into at the time the transactions were restructured and to enforce the lease agreements. With regard to the reasonableness of the income and residual value projections relating to the computer equipment, differences between the experts concerned the methodology to be used, the value or premium to be associated with the existing end-user leases, and the use of inflation and present-value adjustments in estimating the residual value of equipment. With regard to the value of the DC-9-31 airplane, differences between the experts concerned the significance of the mechanical overhaul the airplane received in the spring of 1974, the effect on the value of the airplane of the existing end-user lease to EAL, and the use of inflation- and present-value adjustments in projecting the 1979 residual value of the airplane. Based on the record, we find that the experts employed by or on behalf of Wyatt were more credible than those used by respondent. We agree with Wyatt's experts that the fair market value and residual value of equipment may be measured by considering fixed rental value. In the instant case, the rental revenue from end users serviced the *652 debt obligations relating to the computer equipment and generated additional net cash flow for the partnership. Wyatt's computer valuation experts concluded that, as of June of 1979, the residual value of the NRG equipment was $ 1,588,904 and that the residual value of the OPM equipment ranged from $ 776,000 to $ 1,968,000. In projecting the 1974 fair market value and the 1979 residual value of the computer equipment, Wyatt's expert properly considered the fixed lease terms under which Wyatt's equipment was leased to end users and the rental revenue to be received from the end users in determining of the value of the equipment. Wyatt's expert concluded that, as of June of 1974, the DC-9-31 airplane had a projected residual value in June of 1979 of $ 3,250,000. Wyatt's expert based his valuation on the market conditions in 1974 and his knowledge of DC-9 airplanes. In determining the 1974 fair market value and the 1979 residual value of the airplane, Wyatt's expert did not reduce his appraised value because of the EAL lease. His approach was corroborated in that EAL failed to renew the lease, and Wyatt was able to sell the airplane for $ 5,921,966 of which $ 3,998,791 was distributed *653 to Wyatt's partners. Wyatt's participation in the computer equipment sale-leaseback transactions and the DC-9-31 airplane sale-leaseback transaction enabled Wyatt to realize approximately $ 2 million in profits on investor total cash investments of approximately $ 2 million. We conclude that in 1974 it was reasonable for Wyatt's partners to believe that the equipment Wyatt purchased would have a residual value ranging from $ 5,614,904 to $ 6,806,904 and that Wyatt would receive considerable additional revenue to service related debt obligations. We have determined that the purchase price agreed to by Wyatt resulted from arm's-length negotiations, that the sales price adequately reflected the fair market value of the equipment, that the financial structure of the transactions was commercially reasonable, that the participants generally adhered to the terms of the various agreements as originally entered into or as restructured, and that the projected income and residual values were not unrealistic. We conclude that there was a reasonable opportunity for petitioners to earn a pre-tax profit in excess of their actual investments in the computer equipment and the airplane, and that *654 Wyatt's investments were supported by economic substance. The transactions before us represent genuine multiple-party equipment-leasing sale-leaseback transactions, motivated by a business purpose and supported by economic substance. Benefits and Burdens of Ownership, and Genuine Indebtedness
Respondent argues that even if the transactions are not devoid of economic substance, the purported sales of the equipment to Wyatt did not transfer the benefits and burdens of ownership of the equipment to Wyatt, and that the transactions should be characterized as mere loans from Wyatt. Whether the benefits and burdens of ownership of the equipment passed to Wyatt is a question of fact that must be ascertained from the intentions of the parties as evidenced by the written agreements read in light of all the relevant facts and circumstances. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). See also Reinberg v. Commissioner, 90 T.C. 116, 132 (1988). In analyzing equipment leasing transactions to determine whether investors possess sufficient benefits and burdens of ownership to be regarded as owners of the equipment, we have *655 held that the following factors generally are neutral to the analysis: (1) The use of a net lease; (2) the absence of significant positive net cash flow during the lease term; and (3) the fact that the rental income stream during the initial lease term is tailored to or matches interest and debt payments. Levy v. Commissioner, supra at 860; Larsen v. Commissioner, supra at 1267; Estate of Thomas v. Commissioner, supra at 433-436. Factors generally relevant to the analysis are: (1) The investors' equity interest in the equipment as a percentage of the purchase price; (2) a useful life of the equipment that extends beyond the lease term; (3) lease renewal or purchase options at the end of the lease term based on fair market value of the equipment at the time of renewal; (4) whether the projected cash flow generated by the rental of the equipment plus the projected residual value of the equipment would allow investors to recoup at least their initial cash investments; (5) whether at some point a "turnaround" is to be reached at which depreciation and interest deductions are to be less than projected income from the *656 lease; (6) whether the net tax savings for the investors are less than their initial cash investments; and (7) the potential for realizing a profit or loss on the sale or re-lease of the equipment. Levy v. Commissioner, supra at 860; Larsen v. Commissioner, supra at 1267-1268; Torres v. Commissioner, 88 T.C. 702, 721 (1987); Gefen v. Commissioner, 87 T.C. 1471, 1492-1495 (1986); Mukerji v. Commissioner, 87 T.C. 926, 967-968 (1986); Estate of Thomas v. Commissioner, supra at 433-438. With respect to the transactions before us, the five-year term of the leases of the computer equipment was less than the anticipated useful life of much of the equipment and the airplane had a useful life extending significantly beyond the lease term. The lease payments Wyatt was to receive with respect to the equipment were at a fair rental value for a fixed five-year term. The cash flow from the net fixed lease payments plus the projected residual value of the equipment would have allowed investors in Wyatt to recoup their initial investments and to earn a profit. The sale or re-lease *657 of the equipment on Wyatt's behalf was to be at fair market value. An investment in Wyatt offered investors tax savings in the early years, but depreciation and interest deductions in later years were projected to be less than the income projected. The projected turnaround point when deductions would be less than income was 1976, which is exactly when the turnaround occurred. Concerning Wyatt's equity interest in the equipment and Wyatt's indebtedness with respect to the equipment, the price Wyatt agreed to pay for the equipment was approximately equal to the equipment's fair market value on the date of purchase. The indebtedness to which the equipment was subject was less than the equipment's fair market value, and the indebtedness was not payable solely out of a percentage of Wyatt's profits from its equipment-leasing activities. Thus, Wyatt had an equity interest in the equipment that it could not prudently abandon, Wyatt's payment of its indebtedness was not contingent, and Wyatt's indebtedness was genuine. Estate of Franklin v. Commissioner, 544 F.2d 1045, 1048 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Marine v. Commissioner, 92 T.C. 958, 980-981 (1989); *658 Narver v. Commissioner, 75 T.C. 53, 98-100 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); see also Waddell v. Commissioner, 86 T.C. 848, 901-902 (1986), affd. 841 F.2d 264 (9th Cir. 1988). The principal amount of Wyatt's nonrecourse indebtedness is to be included in Wyatt's tax basis in the equipment. Crane v. Commissioner, 331 U.S. 1, 11 (1947). In addition, Wyatt's interest expenses related to Wyatt's nonrecourse indebtedness are deductible expenses. Estate of Franklin v. Commissioner, supra at 1049. We note that the at-risk rules of section 465 are not applicable to the years at issue, and therefore that the nonrecourse nature of Wyatt's indebtedness is not, per se, a factor in our conclusion as to the genuineness of Wyatt's indebtedness. [5]
*659 Based on the above, we conclude that Wyatt acquired significant benefits and burdens of owning the computer equipment and the DC-9-31 airplane, particularly the potential to realize a profit or loss on sale or re-lease of the equipment. See Levy v. Commissioner, supra at 862; Gefen v. Commissioner, supra at 1492; Estate of Thomas v. Commissioner, supra at 434; Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238. Wyatt is to be considered the owner of the computer equipment and the DC-9-31 airplane for Federal income tax purposes during the years in issue. Activity for Profit
In order to find under section 183 that Wyatt engaged in the transactions before us for profit, we must conclude that Wyatt had an "actual and honest objective of making a profit." Marine v. Commissioner, supra at 988; Levy v. Commissioner, supra at 871; Hulter v. Commissioner, 91 T.C. 371, 392-393 (1988); Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although *660 a reasonable expectation of profit is not required, the activity must be entered into in good faith, with the objective of realizing a profit. Sec. 1.183-2(a), Income Tax Regs.; Hirsch v. Commissioner, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Marine v. Commissioner, supra at 988. Where a partnership is involved, the analysis of profit objective is made at the partnership level. Polakof v. Commissioner, 820 F.2d 321, 323 (9th Cir. 1987), affg. a Memorandum Opinion of this Court; Marine v. Commissioner, supra at 988; Hulter v. Commissioner, supra at 393. The issue of whether the requisite profit objective exists is one of fact to be resolved on the basis of all the evidence. Hulter v. Commissioner, supra at 393; Landry v. Commissioner, 86 T.C. 1284, 1304 (1986); Brannen v. Commissioner, 78 T.C. 471, 506 (1982), affd. 722 F.2d 695 (11th Cir. 1984). The financial economics of the transaction and other objective factors are particularly relevant in this analysis. The testimony of the *661 general partners and the testimony of petitioners and other subjective factors also are relevant. Levy v. Commissioner, supra at 872. In our earlier analysis of the economic substance of the transactions at issue, we commented on many of the objective factors that indicate the presence of a good faith profit objective on the part of Wyatt in entering into these transactions. Certainly a better job could have been done. Estimates of the fair market value of the computer equipment turned out to be high and participants in the transactions suffered unexpected financial difficulties. In spite of these mistakes, however, and in light of many other factors we have discussed, we conclude that Wyatt was conducted in a businesslike manner. With regard to the equipment purchased from NRG, from June of 1974 through June of 1979, Wyatt expected to receive from NRG sufficient funds to pay the monthly installments on the Wyatt-Castle-NRG notes and to have a cumulative net cash flow in the amount of $ 1,290,492. In addition, Wyatt expected that the residual value of the NRG computer equipment and of the DC-9-31 airplane would total $ 4,838,904. As of June 1979, Wyatt *662 would have received a total of $ 6,129,396 -- the total of the cumulative net cash from the lease payments ($ 1,290,492) plus the projected residual value of the equipment ($ 4,838,904). At the same time, Wyatt would have paid Castle a total of $ 5,415,456 -- $ 1,398,056 cash investment plus $ 4,017,401 in interest and principal on its related promissory notes. The difference between the total amount Wyatt expected to receive and the total amount Wyatt expected to pay on the NRG transaction, $ 713,940 ($ 6,129,396 minus $ 5,415,456), represented expected profits to Wyatt with regard to the computer equipment and the DC-9-31 airplane purchased from NRG. With regard to the computer equipment purchased from OPM, Wyatt projected that it would have a net cash flow of $ 240,474 for the period January 1975 through March 1978, and a net cash flow of $ 92,490 for the period April 1978 through June 1979, for a total cumulative net cash flow of $ 332,964. In 1974, Wyatt made a cash investment in the computer equipment purchased from OPM of $ 360,750, and Wyatt in 1979 was obligated to make a balloon payment of $ 1,036,643. In order to realize a profit on the OPM transaction, the residual *663 value of the OPM equipment would have to equal $ 1,064,429 -- $ 1,397,393 total to be invested minus $ 332,964 cumulative net cash flow. We accept Wyatt's expert's testimony that the OPM computer equipment had an expected residual value ranging from $ 776,002 to $ 1,968,000. Thus, it was not unreasonable for Wyatt to expect a profit on the OPM transaction. In 1975, NRG experienced financial difficulties and rather than abandon its investment in the equipment, Wyatt entered into new agreements with Castle and NRG to restructure the transaction. In addition, when Castle defaulted on its obligations to NRG and OPM, Wyatt assumed Castle's obligations to mitigate losses on this transaction. Wyatt's actions in initially structuring the transactions, in restructuring the NRG transaction, and in assuming Castle's debt obligations after Castle's default are indicative of Wyatt's profit objective from the time the transactions were entered into until the time the equipment was sold. Another significant factor indicating that Wyatt engaged in the transactions with an actual and honest objective of making a profit is the fact that Wyatt actually made profits of approximately $ 2 million *664 from these transactions. We conclude that Wyatt engaged in the transactions at issue with the actual and honest objective of earning a profit. Depreciation Deductions
Respondent argues that because Wyatt did not own the computer equipment or the DC-9-31 airplane, and because Wyatt did not engage in business for the first six months of 1974, Wyatt for 1974 improperly claimed a complete year of depreciation on the equipment. Petitioners argue that Wyatt properly elected to claim depreciation on the equipment for 1974 under the "modified half-year convention." We already have concluded that Wyatt owned the computer equipment and the airplane. We agree with respondent, however, that Wyatt, for 1974, is not allowed a complete year of depreciation on the equipment. Under section 167(a)(1) and (2), taxpayers are allowed reasonable depreciation deductions for wear and tear of property used in a trade or business and of property held for the production of income. Generally, depreciation of property begins when the property is placed in service and ends when the property is retired from service. Sec. 1.167(a)-10(b), Income Tax Regs. However, for property placed in service *665 after December 31, 1970, but before 1981, taxpayers may elect annually to use the asset depreciation range and class life system ("ADR system") for determining the amount of depreciation deductions for designated classes of assets. Sec. 1.167(a)-11(a)(1), Income Tax Regs. Once a taxpayer adopts one of the conventions available under the ADR system (see sec. 1.167(a)-11(c)(2), Income Tax Regs.), the taxpayer's depreciation deduction is determined in part by applying that convention. [6]
The modified half-year convention is one of the conventions a taxpayer could elect under the ADR system. Sec. 1.167(a)-11(c)(2)(ii), Income Tax Regs. Under the modified half-year convention, depreciation deductions claimed on all property placed in service at any time during the first half of a taxable year are treated, for depreciation purposes, as having been placed in service on the first day of the taxable year. Sec. 1.167(a)-11(c)(2)(ii), Income Tax Regs.
With respect to the first taxable year a taxpayer engages in business, *666 however, depreciation under the ADR system, including the modified half-year convention, is to be computed on the basis of the actual number of months the taxpayer is in business during its first taxable year (i.e., from the day the taxpayer first enters into business). Sec. 1.167(a)-11(c)(2)(iv), Income Tax Regs.; Torres v. Commissioner, 88 T.C. 702, 734-737 (1987). After trial, petitioners conceded that although Wyatt was formed in 1973 it did not begin to engage in business until the spring of 1974. Petitioners now contend that Wyatt's first taxable year should be regarded, for depreciation purposes, as beginning no later than April 1, 1974. On the facts before us, we conclude that Wyatt's first taxable year began on June 28, 1974, when Wyatt first acquired equipment. Wyatt's depreciation deductions for 1974 under the ADR system are to be computed on that basis. Prepaid Interest of $ 1,758,808
As previously explained, interest was to accrue on Wyatt's promissory notes at 12 percent per year for the entire term of the notes. Regular interest payments were to accrue and were to be paid on a monthly basis by Wyatt during the first year of the notes, *667 reflecting this 12-percent annual interest charge. With the exception of the debt obligations that were restructured in 1975, the monthly payments of interest that were due on the notes in 1974 and 1975 were made by Wyatt. In addition on June 28, 1974, the day the transaction was closed, Wyatt made an interest payment on its promissory notes due Castle in the total amount of $ 1,758,808, representing a prepayment of interest due with respect to the last 15 months of the term of the notes. Section 163 allows a deduction from gross income for "all interest paid or accrued within the taxable year on indebtedness." The pertinent Treasury regulations provide that, in general, interest paid or accrued within the taxable year shall be allowed as a deduction in computing taxable income. Sec. 1.163-1(a), Income Tax Regs. Under the cash receipts and disbursements method of accounting, amounts representing interest expenses generally are deductible in the taxable year in which the payments are made. Sec. 1.446-1(a), (b), and (c)(i), Income Tax Regs.
The courts and respondent historically have deferred to loan agreements between debtors and creditors where the agreements make specific *668 provision for the accrual or allocation of loan payments between principal and interest -- at least where the allocations are made pursuant to bona fide, arm's-length agreements. Prabel v. Commissioner, 91 T.C. 1101, 1113 (1989), affd. 882 F.2d 820 (3d Cir. 1989); Bayou Verrett Land Co. v. Commissioner, 52 T.C. 971, 985-986 (1969), affd. in part and revd. in part on other grounds 450 F.2d 850 (5th Cir. 1971). In spite, however, of agreements between parties to a loan, the timing of interest deductions is subject to the requirement of section 446 that the method of accounting for such deductions clearly reflect income. Prabel v. Commissioner, supra at 1114. Under section 446(b), respondent has broad authority to determine whether a taxpayer's method of accounting clearly reflects income. Commissioner v. Hansen , 360 U.S. 446, 467 (1959). That authority reaches not only overall methods of accounting, but also a taxpayer's method of accounting for specific items of income and expense. Sec. 1.446-1(a), Income Tax Regs.; Grynberg v. Commissioner, 83 T.C. 255, 264-267 (1984); *669 Keller v. Commissioner, 725 F.2d 1173, 1179 (8th Cir. 1984), affg. 79 T.C. 7 (1982); Burck v. Commissioner, 533 F.2d 768, 773 (2d Cir. 1976), affg. 63 T.C. 556 (1975); Prabel v. Commissioner, supra at 1112. Wyatt's June 28, 1974, $ 1,758,808 prepayment of interest on its promissory notes increased significantly Wyatt's taxable losses and caused an obvious and significant distortion in those losses. No legitimate business reason of Wyatt has been suggested for this prepayment of interest due with respect to the last year of the promissory notes, and we perceive no grounds for allowing the deduction claimed therefor. Grynberg v. Commissioner, supra at 266-267. The $ 1,758,808 prepaid interest is to be allocated to and deducted in the period with respect to which it relates (namely, the last 15 months of the term of the notes). [7]
Wyatt's Allocation of Income and Losses
Respondent does not dispute that in 1974 partnership *670 allocations of "bottom-line" taxable income and losses were not subject to the substantial-economic-effect test of section 1.704-1(b)(2), Income Tax Regs., as in effect for 1974. See Hamilton v. United States, 687 F.2d 408, 413 (Ct. Cl. 1982); Boynton v. Commissioner, 72 T.C. 1147, 1157-1160 (1979), affd. 649 F.2d 1168 (5th Cir. 1981); Holladay v. Commissioner, 72 T.C. 571, 585-587 (1979), affd. 649 F.2d 1176 (5th Cir. 1981); H. Rept. No. 1337, 83d Cong., 2d Sess. A223 (1954); S. Rept. No. 1622, 83d Cong., 2d Sess. 379 (1954); 1 A. Willis, Partnership Taxation, sec. 25.11 pp. 316-319 (1976); W. McKee, W. Nelson and R. Whitmire, Federal Taxation of Partnerships and Partners, par. 10.06 [1] pp. 10-45 and n.99 (1st ed. 1977). Respondent, however, argues that Wyatt's allocation of bottom-line taxable income and losses should not be allowed because the contributing partners (to whom 100 percent of the losses was allocated) were projected in the Wyatt offering memorandum to make a profit on their investments and because the contributing partners stood to benefit so significantly from tax deductions arising *671 from the transactions. Petitioners argue that Wyatt's allocation should be respected for Federal income tax purposes so long as the allocation, in form and substance, follows the allocation of income and losses as set forth in the partnership agreement and is not done solely to facilitate tax avoidance. Pre-1976 allocations of bottom-line taxable income and losses must accurately reflect the economic substance of the provisions of the partnership agreement with respect to the partners' rights against one another and not with respect to the partners' individual Federal tax liabilities. Boynton v. Commissioner, supra at 1158-1159. Artificial allocations of bottom-line income and losses that are to be used solely for tax purposes will not be recognized. Holladay v. Commissioner, supra at 587; Kresser v. Commissioner, 54 T.C. 1621, 1632 (1970). In analyzing the economic substance of allocations of bottom-line taxable income and losses, the substance rather than the form of the allocation controls. Hamilton v. United States, supra at 414; Boynton v. Commissioner, supra at 1158-1159; *672 Kresser v. Commissioner, supra; 1 A. Willis, Partnership Taxation, supra. The Wyatt limited partnership agreement allocates 30 percent of Wyatt's bottom-line net income to the contributing partners and 100 percent of its bottom-line losses to the contributing partners. The remaining 70 percent of the bottom-line net income is allocated to the general partners. We conclude that Wyatt's allocation of 100 percent of the losses and 30 percent of the income to the contributing partners accurately reflects the substance of the partnership agreement with respect to the partners' rights against one another and was not a sham. Remaining Issues
Respondent summarily argues that a portion of the amount Wyatt deducted as interest on its 1974 partnership return should be recharacterized as nondeductible organization and syndication fees. We already have disallowed the $ 1,758,808 in prepaid interest that Wyatt claimed in 1974. The additional $ 338,538 in interest claimed in 1974 reflected interest paid by Wyatt over the course of the last six months of 1974 as monthly interest due on its promissory notes. Respondent has provided no reason why this latter *673 amount, or any portion of it, should be recharacterized as organization or syndication fees. We hold for petitioners on this issue. Respondent contends that additional interest under section 6621(c) should apply to the tax deficiencies determined herein because the transactions entered into by Wyatt involved valuation overstatements (see sec. 6659(c)), transactions not entered into for profit (see sec. 301.6621-2T, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 50390 (Dec. 28, 1984)), or sham or fraudulent transactions (see sec. 6621(c)(3)(A)(v)). In light of our findings and conclusions on the primary issues, additional interest under section 6621(c) is not applicable. Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect for the year in issue.↩
2. Use in the findings of fact of the words "purchased," "sold," "transferred," "debt obligations," and "leased," and variations thereof, reflect only the form of the transactions under consideration and are not to be read as affirmative findings of fact in this case. The ultimate character of the transactions is analyzed later in this opinion.↩
*. Monthly payments of $ 267,090 included interest computed at 12 percent per year. Wyatt's appraiser does not include the invoice cost in his appraisal.
**↩ Monthly payments of principal increased approximately $ 2,000 each month.
*. Payments of $ 68,920 included interest computed at 12 percent per year. ** Monthly payments of principal increased approximately $ 535 each month.↩
3. Allocation of these airplane sales proceeds was based on the allocation formula set forth in Wyatt's original partnership agreement with respect to the allocation of "residual proceeds" from sale of equipment.↩
4. $ 6.1 million minus $ 2.6 million equals $ 3.5 million.↩
*. This July 1979 projected residual value is discounted to June 1974 by using a 10-percent discount factor. It does not include an inflation factor.↩
*. Respondent's appraiser also offers alternative figures (of $ 3,315,000 as of June 1974, and $ 1,176,000 as of June 1979) to reflect a 15-percent discount to the fair market value of the DC-9-31 airplane attributable to the terms of the end-user lease to EAL. Respondent's appraiser applies a 7-percent inflation rate in determining the 1979 residual value.↩
***. Includes a lease premium of 5 to 15 percent.↩
5. Certain language in the written debt obligations of Wyatt to Castle is similar to language that was involved in HGA Cinema Trust v. Commissioner, T.C. Memo. 1989-370↩, that was held in that case to make debt obligations of the partnership contingent. No timely argument has been made by either of the parties in the instant case that such language has a bearing on the issues before us.
6. The Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 203, 221, generally repeals the ADR system for property placed in service after December 31, 1980.↩
7. Neither petitioners nor respondent have suggested any particular method for amortizing the prepaid interest over the life of the loans.↩